UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
VITALY IVANITSKY,

                    Petitioner,

                                                              NOT FOR PUBLICATION
          -against-                                           **MEMORANDUM & ORDER**
                                                              13-cv-00823 (CBA)

PATRICK J. GRIFFIN,

                    Respondent.
---------------------------------------------------------x

**AMON, United States District Judge:**

On February 11, 2013, Vitaly Ivanitsky ("Ivanitsky" or "Petitioner") pro se sought a writ

of habeas corpus pursuant to 28 U.S.C. § 2254.  (ECF Docket Entry ("D.E.") # 1 ("Orig. Pet.").)[1]

At his request, the petition was stayed to permit him to exhaust two additional claims in state court.

(D.E. # 16.)  Ivanitsky filed his amended habeas petition on June 15, 2021.  (D.E. # 23 ("Am.

Pet.").)  I denied Ivanitsky's request for counsel pursuant to 28 U.S.C. § 1915(e)(1) because his

claims likely lacked merit.  (D.E. # 28.)  For the reasons set forth below, Ivanitsky's petition

seeking a writ of habeas corpus is DENIED.

## BACKGROUND

### I.      The Homicides and the State Trial Proceedings

On January 31, 2008, Ivanitsky was convicted of two counts of second degree murder in a

joint trial with Marat Krivoi ("Krivoi") before separate juries.  The charges arose out of the murder

of Boris Roitman ("Roitman") on August 26, 1992 and of Thein Diep ("Diep") on September 23,

1992.  (Orig. Pet. 1, 10.)  The 1992 homicides remained unsolved until 2005, when Pyotr Sarkisov

("Sarkisov"), an accomplice in the homicides who was facing federal racketeering charges, and

---

[1] Ivanitsky submitted alongside this original petition his counseled direct appeal brief.  (Orig. Pet. 9-89.)  I refer to it
as Ivanitsky's recitation of the facts and relevant arguments here.

Natan Gozman ("Gozman"), another criminal associate also facing federal charges, began cooperating with federal law enforcement authorities. (D.E. # 12 ("Resp.") 2; Orig. Pet. 13.) Their cooperation led to Ivanitsky's indictment in 2006. (Orig. Pet. 13.)

### A. The Roitman Murder

Sarkisov testified that Krivoi initiated a plan with Sarkisov and Ivanitsky to kill Roitman because he heard from a "reliable . . . source . . . that Boris was [an] informant." (Tr. 372.[2]) On the night of the murder, Ivanitsky acted as the lookout while Sarkisov shot and killed Roitman, after Krivoi had lured Roitman to the area. (Id. 440-43, 447, 459; Resp. 2.)

An eyewitness Pal Karpaty ("Karpaty") observed two men running away from the scene, one of them carrying a shotgun. (Orig. Pet. 17; Resp. 47-48.) When the two men approached him, Karpaty pretended he had not heard the gunshot and told the men that they had "scared the hell out of [him]." (Ex. L[3] 49; Orig. Pet. 17.) After they passed him, Karpaty called 911, telling the operator that a man was shot near a tennis club and that he saw two men fleeing the scene. (Ex. K ("Karpaty 911 Transcript") 35-36.) A police sergeant put out a description of the perpetrators as two white males, which was later altered to Black and then revised to Latino or Hispanic. (Id. 41-52.) After the homicide investigation was revived in 2005, Karpaty stated during an interview with the FBI that one of the perpetrators of the Roitman homicide was holding a double-barreled shotgun. (Ex. M ("FBI 302 Report") 51; Resp. 50-51.)

Sarkisov testified that the group prepared for the murder of Roitman by practicing firing a shotgun and a .380 caliber pistol into a stack of telephone books at a friend's apartment. (See Tr.

---

[2] Page numbers refer to ECF pagination in the record documents except for the transcript of the state court proceedings, which are cited as "Tr." for the trial and "H. Tr." for pre-trial hearings, and are submitted as Exhibit A to Respondent's original submission in this case.

[3] Hereinafter, all documents cited as "Ex. __" refer to exhibits to Respondent's original brief. Documents cited as "Am. Ex. __" refer to exhibits to Respondent's amended brief. For clarity, citations remain to the ECF pagination.

399-406.)[4]  Gozman testified that two or three weeks after the murder, Ivanitsky described to him how Roitman was killed with a shotgun at close range and "as a result of that, his body was damaged pretty" bad.  (See id. 2080-88.)  According to Gozman, Ivanitsky said that a shotgun was a good weapon to use because shotguns are "very powerful" and do not "leave any traces at all." (Id. 2087.)

### B.  The Diep Murder

Sarkisov testified that on the evening of Diep's murder, he, Krivoi, Ivanitsky, and Edik Livchits were at a pool hall frequented by Diep.  (Id. 496-99; Orig. Pet. 43-44.)  According to Sarkisov, Krivoi told the group that he wanted to rob Diep because he suspected that Diep was involved in prostitution and would have cash.  (Tr. 498-99; Orig. Pet. 44.)  They proceeded to abduct Diep at gunpoint (Krivoi used a .380 pistol) and force Diep into the backseat of his own car; Ivanitsky was the driver.  (Tr. 502-03, 506-10, 517.)  As the group drove towards Diep's house, Krivoi shot Diep twice in the head.  (Id. 514, 518-20; Orig. Pet. 45.)  The group set Diep's car and body on fire; later, Krivoi and Ivanitsky returned to the scene to burn the car again.  (Tr. 525, 537-38, 545-48, 555-56; Orig. Pet. 45.)

After Ivanitsky's arrest, he was interrogated by Detective Peter McMahon about the Diep homicide.  (Tr. 1364, 1371.)  Detective McMahon testified at trial that Ivanitsky admitted he had once witnessed his "friends" set a car on fire in a "secluded area," somewhere off of the Belt Parkway, consistent with where Diep's car was eventually found.  (Id. 1378-79, 1385.)  In response to McMahon's question about whether Ivanitsky was in the car when Diep was shot, he said that he "never heard the gunshot" and nodded his head that he knew "that guy never got out of the car" (i.e., that Diep was killed in his car).  (Id. 1379-84.)

---

[4] Gozman also testified that Ivanitsky told him about the test-firing.  (Tr. 2114-15.)  This testimony was corroborated by physical evidence recovered at the apartment.  (See id. 1880-92.)

The State also introduced at trial photographs of a .380 Colt Government Model pistol as demonstrative evidence to elucidate Sarkisov's testimony about Diep's murder.  (Id. 343-55.)  It was uncontested that the photographs did not depict the actual gun used to kill Diep, but the same type of weapon.  (Id. 392-97; Resp. 16-17.)  The trial court explained the photograph was "not the weapon that was used in the killing of Mr. Diep" and was "only introduced to show the kind of weapon that was used."  (Tr. 396-97.)  Sarkisov testified that he saw Krivoi in possession of a .380 Colt handgun prior to the Roitman and Diep murders.  (See id. 343-55.)

Gozman testified that while he was living with Ivanitsky, Gozman told Ivanitsky that he had murdered Yanik Megasyev at close range.  (Id. 2144.)  This prompted Ivanitsky to relay that "he had experienced [sic] as well" and that he had he had been involved with killing a "Chinese person" who "said that he was kind of a criminal" and that Ivanitsky and Krivoi had "just put him in the car and . . . drove him down."  (Id. 2145; see also id. 2272 ("He told me that they killed him . . . they shot him.").)  They also discussed how to dispose of "dead bodies," and when Gozman said that using a woodchipper "may be the good idea . . . because it's really effective," Ivanitsky replied that a better idea would be "to put dead body inside the car and to douse it with the gas. And to put a lot of gas over the vehicle as well . . . [a]nd to set it on fire" because "after 30 minutes, it goes beyond recognition."  (Id. 2146-47.)

## II.    Disputes Related to Evidence Introduced at Trial

During pretrial proceedings, the State moved to introduce evidence of various uncharged criminal acts.  The trial court precluded evidence relating to an AK-47 assault rifle (and various uncharged crimes committed with it that were not connected to the two murders) as well as Ivanitsky's association with the Tatarin Brigade and its kidnapping of a woman named Flora

Gulyan ("Flora"). (Orig. Pet. 21-23.) Ultimately evidence about these matters came in through Sarkisov's and Gozman's testimony.

### 1. The AK-47

In response to a question of Krivoi's counsel on cross-examination about the ownership of guns, Sarkisov testified that he had possessed a shotgun and an AK-47. (See Tr. 712, 751; Orig. Pet. 25-26.) Over Krivoi's and Ivanitsky's objection, the trial court allowed the State to elicit testimony about the AK-47 on the theory that Krivoi had opened the door to questions about how Sarkisov obtained the gun and whether it was used in crimes. (Tr. 867-72.) According to Sarkisov, the AK-47 was given to Sarkisov by Krivoi's ex-wife, Alesya Nayfeld, while Krivoi was in prison. The gun was inside a tennis bag that also contained the shotgun used in the Roitman murder and the .380 Colt pistol used in the Diep murder. (Id. 652-53, 891-93, 934.) Sarkisov further testified that the AK-47 was used in "some crimes that we commit," and that Krivoi and Ivanitsky were present during each of those crimes. (Id. 891, 941-42.) Similarly, on direct examination of Gozman, the prosecution elicited testimony that Ivanitsky "committed [crimes] with the AK47," but Gozman was asked not to go into detail on those crimes. (Id. 2141.)

### 2. Other Uncharged and Bad Acts

On cross-examination, Krivoi's attorney also asked Gozman about Gozman's participation in other crimes, including the kidnapping of Flora and the murder of Sergei Kobozev. (Id. 2370-79; Resp. 19-20.) Gozman testified that Flora was brought to Ivanitsky's apartment, implicating Ivanitsky in the kidnapping. (Tr. 2370-79.) Krivoi's counsel asked Gozman whether he knew that the men who brought Flora to the apartment were murderers. (Id. 2377.) In response, Gozman implicated Ivanitsky in the Kobozev murder but did not say that Ivanitsky killed Kobozev. (Id.

2378; Orig. Pet. 36.)  Ivanitsky's counsel did not object, request curative instructions, or move for a mistrial.  (See Orig. Pet. 75-76.)[5]

Defense counsel repeatedly attacked Gozman's credibility at trial.  Gozman acknowledged that he had lied to the FBI; admitted that he might, under certain circumstances, lie to stay out of jail; and testified to a long history of other crimes and substance abuse.  (D.E. # 25 ("Am. Resp.") 17 (citing, e.g., Tr. 2115-16, 2433-34).)  He detailed the terms of his cooperation agreement with the State and the incentives the State provided him with in exchange for his truthful testimony. (Tr. 2187-89.)

On re-direct examination, Gozman testified to a variety of other uncharged crimes and, over Ivanitsky's objection, implicated Ivanitsky as a member of the Tatarin Brigade.  The prosecution also showed a photo in which Ivanitsky appeared alongside the "brigade['s] . . . main guys."  (Id. 2457.)  In balancing Ivanitsky's counsel's re-cross examination and the prosecution's application to re-open their re-direct examination of Gozman to detail Ivanitsky's role in the kidnapping, the trial court denied the prosecution's application, but also precluded Ivanitsky's counsel from arguing in summation that Ivanitsky had not participated in Flora's kidnapping.  (Id. 2486-87.)  Ivanitsky's counsel did not object to the ruling.  (Id. 2487.)

Sarkisov testified that he committed unspecified crimes with Gozman, Krivoi, and Ivanitsky.  (See Tr. 294.)  The trial court promptly gave a limiting instruction to "disregard that testimony and . . . draw no inference that either Mr. Ivanitsky or Mr. Krivo[i] committed the crimes that he listed."  (Id. 294-95.)  At other points, the court cautioned the jury as to the limited relevance of the testimony.  (Id. 341, 342, 347, 352, 354, 355, 359, 406.)  The testimony was characterized as "offered to show the relationship with Mr. Sarkisov and Mr. Vitaly Ivanitsky and that

_____

[5] Gozman did not implicate Ivanitsky in the Kobozev murder when discussing it on direct examination.  (Tr. 2120-24.)

6

relationship being established prior to the commission of the [alleged] crimes," or "to show or prove the acting in concert element or characterization of the crimes in question." (Id. 354, 359; see also id. 410.)

In its jury charge at the conclusion of trial, the court reiterated that the other crimes evidence "must not be considered for the purpose of proving that the defendant had a propensity or a predisposition to commit the crimes charged in this case" but that it was "offered as evidence for your consideration on the question of the defendant's relationships" with Sarkisov and Gozman. (Id. 3026-27.)

### III.    Disputes Related to Evidence Excluded at Trial

The trial court excluded certain evidence that defendants sought to admit and arguments that defendants sought to mount. The court excluded Karpaty's 2005 FBI interview in which he stated that one of the individuals involved in the Roitman shooting held a double-barreled shotgun (Krivoi's shotgun was single-barreled) because it lacked sufficient indicia of reliability. (H. Tr. dated 6/19/07 at 49-62.) Karpaty's 911 call from the night of the murder, in which the suspects were alternatively described as "two white males," "two male Hispanics," and "[t]wo male blacks," was not admitted because the statements containing racial descriptions of the suspects were made by police, not Karpaty, so did not fall under the excited utterance hearsay exception. (Id. 62-68; see Karpaty 911 Transcript 35-36, 41-43.) The trial court also barred Krivoi's counsel from cross-examining the FBI's ballistics expert for the Diep murder about the differences in mass and velocity of bullets fired from .380 and 0.38 caliber handguns. (See Tr. 2010-13; Resp. 53-54.)

### IV.    Direct Appeal

On direct appeal, Ivanitsky argued that (1) he was deprived of his right to due process by the trial court's admission of uncharged criminal conduct; (2) he was denied the effective

assistance of counsel in that counsel failed to (a) object to the uncharged crimes evidence and (b) move to sever Ivanitsky's trial from Krivoi's; (3) the evidence presented against him was legally and factually insufficient to convict him of the Roitman murder because the accomplice testimony was not adequately corroborated; (4) he was denied his right to present a full and adequate defense by the trial court's exclusion of hearsay evidence and restriction of his cross-examination of the ballistics expert; and (5) the prosecution suppressed exculpatory evidence.  (Ex. F.)

On February 22, 2011, the Appellate Division, Second Department, affirmed the conviction.  People v. Ivanitsky, 81 A.D.3d 976 (2d Dep't 2011) ("Ivanitsky I").  The court found that (1) Ivanitsky's claim concerning the admission of uncharged crime and bad act evidence was "without merit"; (2) Ivanitsky received effective assistance of counsel; (3) the evidence was "legally sufficient to establish the defendant's guilt beyond a reasonable doubt" and that the "verdict of guilt was not against the weight of evidence"; (4) Ivanitsky's claim that the trial court has violated his right to present a defense was unpreserved for appellate review and, in any event, was without merit; and (5) Ivanitsky's claim alleging the suppression of exculpatory evidence was unreviewable by the appellate court because it was "dehors the record on appeal."  Id. at 976-77.  The New York Court of Appeals denied leave to appeal on February 22, 2012.  18 N.Y.3d 925 (2012) (Lippman, Ch. J.).

V.    **Post-Conviction Proceedings**

On February 11, 2013, Ivanitsky filed his first pro se petition for a writ of habeas corpus in this Court.  (Orig. Pet.)  Ivanitsky raised the same claims he had raised on direct appeal.  In addition, he raised three new claims pursuant to CPL § 440.10 in a "Ryder" attached to the petition: (1) fraud and misrepresentation by the prosecutor, (2) newly discovered evidence, and (3) violation of his state and federal constitutional rights. (Id. 7.)  I stayed his petition to allow Ivanitsky to

exhaust claims of prosecutorial misconduct and suppression of <u>Brady</u> material.  (D.E. # 16.)  I cautioned that my order "should not be construed as a license for Ivanitsky to bring other claims on habeas review that were not brought to the Court's attention in the first instance."  (<u>Id.</u> 2.)

In his § 440 motion, Ivanitsky argued that Sarkisov testified falsely that Krivoi's ex-wife, Nayfeld, gave him a tennis bag containing the shotgun used in the Roitman murder and the handgun used in the Diep murder; that Gozman testified falsely to Ivanitsky's involvement in the Flora kidnapping; and that proposed testimony from Nayfeld, Flora, Alexander Spitchenko, and Mikhail Kremen ("Kremen") constituted newly discovered evidence that would have changed the result of his trial.  (Am. Ex. A.)  In support of his motion, Ivanitsky submitted an affidavit from Kremen, a friend of Ivanitsky's, claiming that Gozman had admitted to lying at trial.  (<u>Id.</u>); <u>see also</u> <u>People v. Ivanitsky</u>, 188 A.D.3d 719, 720 (2d Dep't 2020) ("<u>Ivanitsky II</u>").

The Supreme Court, Kings County, denied this § 440 motion on March 26, 2014, holding that Ivanitsky's claims were meritless.  (Am. Ex. C ("440 Op.").)  The § 440 court construed Ivanitsky's motion as one related to newly discovered evidence showing that the two cooperating witnesses testified falsely, and that this testimony constituted a fraud upon the court; the court did not construe Ivanitsky to be asserting that the State committed a <u>Brady</u> violation.  (<u>Id.</u> 2.[6])  It held that Ivanitsky could not advance a newly discovered evidence claim because "the statements of Nayfeld, Gulyan and Spitchenko could all have been obtained by the defendants prior to trial through exercise of due diligence," and it "merely impeach[ed] or contradict[ed] the trial testimony of Sarkisov or Gozman on two minor matters at trial," showing "no probability that the outcomes

---

[6] The § 440 court decided Ivanitsky's motion in an opinion also concerning Krivoi's § 440 claim (<u>id.</u> 2 ("Defendant Krivo[i] joins in defendant Ivanitsky's motion and asserts the addition claim that the People committed a <u>Brady</u> violation" on the basis of Nayfeld's statement)), and denied Krivoi's <u>Brady</u> argument concerning the same evidence on the grounds that "[i]t is highly unlikely that the jury's determination of Sarkisov's credibility would have been undermined by the addition of Nayfeld's impeaching statements [because] Sarkisov was extensively cross-examined by both defendants at trial," (<u>id.</u> 10).

of the trial would have been more favorable." (Id. 12-13.)  The Kremen affidavit was rejected because it was unspecific and Gozman was thoroughly cross-examined. (Id. 13.)  The court held that Ivanitsky could not show the State relied on false testimony constituting prosecutorial misconduct because "a conflict between the testimony of two witnesses creates a credibility issue for the jury, but does not establish that either one of the witnesses was lying." (Id. 14-15 (citing, inter alia, United States v. Bortnovsky, 879 F.2d 30, 33 (2d Cir. 1989)).)

Ivanitsky appealed this decision in December 2019. (Am. Ex. F.)  In this brief, Ivanitsky abandoned his claims about the improper use of false testimony and argued only that the lower court had improperly denied his newly discovered evidence claim based on the Kremen affidavit without holding an evidentiary hearing. (Id.)  The Appellate Division, Second Department, affirmed the lower court's decision. Ivanitsky II, 188 A.D.3d 719.  The court held that "[g]iven the highly questionable reliability of the proffered evidence, its tangential relevance to the crimes of which the defendant was convicted, and the strength of the other evidence presented by the prosecution at trial, there was no reasonable probability that the verdict would have been more favorable to the defendant had the proffered newly discovered evidence been introduced at trial, and a hearing on the motion was not warranted." Id. at 720.  The New York Court of Appeals denied leave to appeal on February 28, 2021.  36 N.Y.3d 1057 (2021) (Wilson, J.).

## STANDARD OF REVIEW

A federal court may grant habeas relief to a state prisoner only for violations of federal law.  28 U.S.C. § 2254(a).  A federal court may deny on the merits, but may not ordinarily grant, habeas relief to claims that were unexhausted in state court. Id. §§ 2254(b)(1)(A), (b)(2).  When the state courts deny a claim on an independent and adequate state procedural ground, the claim is "defaulted," and a federal court may not grant habeas relief unless the petitioner can show cause and prejudice. Coleman v. Thompson, 501 U.S. 722, 750 (1991).  When the state courts have

reviewed a petitioner's claims on the merits, "a federal court shall grant the writ only if the relevant state court decision (1) was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Musaid v. Kirkpatrick, 114 F.4th 90, 107 (2d Cir. 2024) (quoting 28 U.S.C. § 2254(d)).  This standard is "difficult to meet."  Harrington v. Richter, 562 U.S. 86, 102 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Id. at 101 (internal quotation marks and citation omitted).

## DISCUSSION

Ivanitsky identifies six grounds for habeas relief: (1) the trial court deprived him of due process by admitting evidence of uncharged crimes; (2) the trial court denied his right to present a full and adequate defense by excluding and/or restricting certain evidence; (3) the evidence was legally and factually insufficient to support a conviction for the murder of Boris Roitman because the accomplice testimony was not adequately corroborated; (4) newly discovered evidence;[7] (5) Ivanitsky's trial counsel rendered ineffective assistance; and (6) the prosecution suppressed potentially exculpatory evidence.  (Am. Pet. 5-11.)  I discuss each of these grounds in turn.

### I.    Uncharged Crimes Evidence

Ivanitsky's first claim is based on the allegedly improper introduction of evidence regarding uncharged crimes.  The evidence falls into three categories:  (1) Sarkisov's and Gozman's direct testimony that their associates including Ivanitsky committed crimes generally;

---

[7] Ivanitsky's fourth claim is phrased as "evidence insufficient; prosecutor[s] bolstered witness's credibility; fraud on the court," and he alleges as supporting facts: "key corroborating witness admitted fabricating his testimony on the murders and to the alleged uncharged crimes . . . ."  (Am. Pet. 10.)  I assume this ground refers to the claim based on Mikhail Kremen's affidavit that Ivanitsky exhausted via his § 440 proceedings.

(2) crimes committed with Krivoi's AK-47; and (3) implication of Ivanitsky in the Tatarin Brigade, specifically the Flora kidnapping and the Kobozev murder.[8]

The erroneous admission of uncharged crimes evidence amounts to a deprivation of due process under the Fourteenth Amendment only if the evidence in question was "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (quoting Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992)). When a judge provides a curative instruction explaining that the jury may not make impermissible inferences from evidence, I assume the jury heeds that instruction. E.g., United States v. Scott, 347 F. App'x 688, 689 (2d Cir. 2009). As an initial matter, Ivanitsky has failed to show that admission of any of the uncharged crimes evidence rose to the level of a due process violation.

I address each of the three claims regarding uncharged crimes in turn. The trial court did not allow the testimony from Sarkisov that he and Gozman generally committed crimes with Ivanitsky to stand. The trial court instructed the jury that "[d]uring the course of Mr. Sarkisov's testimony, he described, in general terms, the crimes that he had committed and named people with whom these crimes were committed . . . including the two defendants . . . I am going to charge you now that you're to disregard that testimony and you're to draw no inference that . . . Mr. Ivanitsky . . . committed the crimes that he listed." (Tr. 294-95.) I presume that the jury adhered to that instruction. Scott, 347 F. App'x at 689. When there was additional testimony from Sarkisov about certain other crimes implicating Ivanitsky or Krivoi, the trial court further explained that the

---

[8] Ivanitsky also challenges as uncharged crimes the introduction of photos of a .380 Colt pistol and Ivanitsky's statement to Gozman "that in order to kill a person with a knife, one is supposed to be the professional killer." (Orig. Pet. 60-65.) The evidence was not proof of uncharged crimes. The former was admitted as a fair and accurate representation of the type of weapon Sarkisov testified was used in the Diep murder. (Resp. 16-17.) The latter does not describe any crime, but Ivanitsky's opinion expressed to Krivoi. (Id. 18; see Tr. 2134-35.) And, either way, the statement provides context for Ivanitsky's admission of involvement in the Diep murder. (Tr. 2134-45.)

State's permissible purpose for eliciting Sarkisov's testimony was to provide "background information to show the relationship between [Sarkisov] and Mr. Vitaly Ivanitsky . . . and that relationship being established prior to the commission of the [alleged] crimes." (Tr. 354.)  The trial court did not abuse its discretion in finding this instruction sufficed.  And even if the inclusion of more specific crimes the group performed (see id. 2440-42) was erroneous, the Appellate Division did not apply binding Supreme Court precedent in a clearly erroneous manner in holding that the elicitation of this evidence did not violate Ivanitsky's right to due process.  Ivanitsky I, 81 A.D.3d at 977.  This evidence was not sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed without it.  The evidence was brief and general in nature, and outweighed by the lengthy, specific evidence on the two murders, outlined in Section I above.

The same analysis applies to the evidence of the AK-47.  The first mention of the AK-47 was elicited by Krivoi's counsel in the cross-examination of Sarkisov during a line of questioning suggesting that other people may have had the motivation and ability to kill Roitman.  (See Tr. 712, 751; see generally id. 710-50; see also Resp. 14-15.)  The trial court found this line of questioning opened the door to evidence that Sarkisov obtained the AK-47 from Krivoi, which also corroborated the transfer of the shotgun and .380 Colt from Krivoi's ex-wife Nayfeld to Sarkisov.  It permitted testimony on certain crimes committed with the AK-47.  The trial court did not abuse its discretion in finding that Krivoi's counsel opened the door to questions about Krivoi's possession and use of the AK-47.

And even if the admission of the AK-47 and general descriptions of the crimes committed with it was erroneous, the challenged evidence was ancillary to the core question of the trial: Ivanitsky's involvement in the Roitman and Diep homicides.  (See, e.g., Orig. Pet. 56 (the AK-47

"had nothing to do with the crime"); Resp. 13.)  The evidence challenged here, mainly using the AK-47 to intimidate others, did not demonstrate that Ivanitsky had a propensity to be involved in gun-related homicides and, more importantly, it did not serve to directly implicate Ivanitsky in the two killings with which he was charged.  See Smith v. Noeth, No. 1:18-CV-00883, 2023 WL 4936942, at *30 (W.D.N.Y. June 27, 2023), report and recommendation adopted, 2023 WL 4933981 (W.D.N.Y. Aug. 1, 2023).  There was no suggestion that Ivanitsky ever fired the AK-47 in a crime or was involved in a crime in which the weapon was used to hurt a victim.  The Appellate Division did not unreasonably apply controlling Supreme Court case law in rejecting Ivanitsky's uncharged crimes claim relating to the AK-47.

The Appellate Division correctly held that testimony implicating Ivanitsky in the Kobozev murder, the kidnapping of Flora, and thus his association with the Tatarin Brigade, was not "sufficiently material to provide the basis for [Ivanitsky's] conviction."  Torres v. Keane, 159 F. App'x 247, 249 (2d Cir. 2005).  The testimony regarding Flora's kidnapping and Kobozev's murder did not unequivocally implicate Ivanitsky as a chief wrongdoer.  Flora was kidnapped by other people and brought to Ivanitsky's (who was watching TV) apartment because they knew Gozman lived there.  (Tr. 2376-77.)  Ivanitsky also challenges that at one point when Gozman described the Kobozev killing he said he "and Vitaly were involved with the boxer," but that he did not know whether Ivantisky ever killed anyone.  (Id. 2378.)  But in two separate more detailed discussions of the Kobozev murder, Gozman said that Vasily Ermichine was involved in that incident without mentioning Ivanitsky.  (Id. 2253-58, 2366-67.)  Given this mismatch, I cannot say that Gozman's naming of Ivanitsky at one point deprived him of due process.[9]

---

[9] Moreover, this testimony was elicited by Krivoi's counsel from Gozman, a heavily impeached coconspirator, not through independent evidence offered by the prosecution.  The jury would likely either believe or disbelieve the cooperator.  The fact that he implicated the defendant in less serious crimes than the ones charged was simply not

Ivanitsky's bald assertion that the "avalanche of uncharged crimes . . . clearly deprived Ivanitsky of his constitutional right to a fair trial" (Orig. Pet. 49) does not cast doubt on the jury's finding of guilt given the on-point evidence.  E.g., Rodriguez v. O'Keefe, 122 F.3d 1057 (2d Cir. 1997).  Moreover, the Appellate Division's conclusion that this claim was meritless does not constitute an unreasonable application of controlling Supreme Court case law.  Ivanitsky I, 81 A.D.3d at 977.

## II.    Excluded Evidence

Ivanitsky's second claim relates to the trial court's exclusion of evidence his counsel sought to present at trial: Karpaty's 911 call, the 2005 FBI 302 report, and a certain line of cross-examination counsel wanted to conduct of the State's ballistics expert.  (Orig. Pet. 85.)  The Appellate Division rejected this claim both as procedurally barred and as without merit. Ivanitsky I, 81 A.D.3d at 977.  I need not decide whether the independent and adequate state procedural ground bar applies, because I find that this claim does not justify habeas relief on the merits.  Because the state court reached the merits on alternative grounds, AEDPA deference to its findings applies.  Jimenez v. Walker, 458 F.3d 130, 145-46 (2d Cir. 2006).

A criminal defendant has the constitutional right to introduce secondary forms of evidence like hearsay when the evidence "bears sufficient indicia of reliability" and "the witness who gave the original testimony is no longer available."  Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988) (citation omitted).  As to lines of cross-examination, trial judges are free to impose reasonable limitations to avoid, inter alia, confusion of the issues or irrelevant questioning. Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986).  The erroneous exclusion of evidence rises to the level of constitutional error cognizable on habeas review only if a petitioner can show that

---

sufficiently material to provide the basis for a conviction or remove a reasonable doubt that would have otherwise existed.  Cf. United States v. Willis, 89 F.3d 1371, 1380 (8th Cir. 1996).

the error resulted in the deprivation of a fundamentally fair trial.  Chambers v. Mississippi, 410 U.S. 284, 302-03 (1973).  For the exclusion of evidence to rise to the level of a fair trial violation, "the evidence must be 'material,' in the constitutional sense that it 'creates a reasonable doubt that did not otherwise exist' as evaluated 'in the context of the entire record.'"  Jimenez, 458 F.3d at 146 (quoting United States v. Agurs, 427 U.S. 97, 112-13 (1976)).  Ivanitsky fails to show that the trial court's exclusion of this evidence constituted an unreasonable application of federal law, especially considering the strength of the other evidence supporting Ivanitsky's conviction.  (See Section I supra.)

First, defense counsel sought to introduce the 911 call as an excited utterance by Karpaty and argued that it was material and exculpatory because "[Karpaty] observed the perpetrators immediately after the shooting and immediately called the police, describing them as two Hispanic males."  (Ex. B 67-68.)  But Karpaty himself did not make an excited utterance to police that he thought the perpetrators were Hispanic.  Instead, the police sergeant stated "I believe they were male Hispanics."  (Karpaty 911 Transcript 43.)  It was not unreasonable to exclude this evidence under state law, and the evidence does not create a reasonable doubt as to Ivanitsky's guilt.

Second, the trial court's exclusion of the FBI 302 report as inadmissible hearsay was not an unreasonable application of Chambers.  It was not unreasonable to conclude that the report did not bear sufficient indicia of reliability to necessitate its admissibility at trial.  Rosario, 839 F.2d at 924.  Karpaty's interview was taken 13 years after the murder, it was unsworn, and Karpaty's recollection that he saw a double-barreled shotgun was not corroborated.  I cannot find "under AEDPA's highly deferential standard of review" that the Appellate Division's rejection of the 302 report claim as without merit "was an unreasonable application of Chambers."  Krivoi v. Chappius, 573 F. Supp. 3d 816, 830 (E.D.N.Y. 2021) aff'd, No. 21-2934-PR, 2022 WL 17481816 (2d Cir.

Dec. 7, 2022).  At best, the 911 call and the 302 report would have only further and cumulatively impeached Sarkisov and Gozman.

Finally, Krivoi's counsel argued that he should be able to cross-examine the State's ballistics expert about the different velocities at which .380 and 0.38 caliber bullets travel because a .380 caliber bullet—the type used in the weapon Krivoi owned—would not have lodged in Diep's head, but would have gone through it.  (Tr. 2010-11.)  The trial court ruled that this line of questioning was irrelevant.  (Id. 2012-13.)  This exercise of the trial court's discretion was not an unreasonable application of federal law with respect to Ivanitsky's right to cross-examine adverse witnesses.  Nor was this exercise of discretion plainly unconstitutional in that the excluded evidence would have introduced reasonable doubt as to Ivanitsky's role in the homicide.

### III.    The Accomplice Corroboration Requirement

Ivanitsky's third claim is that there was insufficient evidence to convict Ivanitsky for the Roitman murder under New York state law.  New York state law includes an accomplice corroboration requirement.  CPL § 60.22.  This claim, however, is not cognizable on federal habeas review because it is based solely on the New York state law accomplice corroboration requirement and not on a federal constitutional right.  Mejia v. Superintendent, Elmira Corr. Fac., 702 F. Supp. 3d 83, 94 (E.D.N.Y. 2023).

### IV.    Newly Discovered Evidence

Ivanitsky's fourth claim is based on the newly discovered evidence claim that he exhausted in state court.  Specifically, he proposes that Nayfeld would impeach Sarkisov by denying that she gave him a tennis bag with the guns, that Flora would impeach Gozman by denying that Ivanitsky or Gozman were present during her kidnapping, that Spitochenko would testify to the same, and that Ivanitsky's friend Kremen would testify that Gozman has since recanted his trial testimony.

(Am. Ex. A.)   There is no need to address whether his exhaustion of this claim was in compliance with my 2013 stay (see D.E. # 16) because it fails on the merits.  The Appellate Division ruled that "[g]iven the highly questionable reliability of the proffered evidence, its tangential relevance to the crimes of which the defendant was convicted, and the strength of the other evidence presented by the prosecution at trial, there was no reasonable probability that the verdict would have been more favorable to the defendant had the proffered newly discovered evidence been introduced at trial."  Ivanitsky II, 188 A.D.3d at 720.  The New York court's decision was not contrary to clearly established Federal law as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).

## V.    Ineffective Assistance of Counsel

Ivanitsky claims that counsel was ineffective for (1) failing to object to certain lines of testimony elicited from Gozman by the State and by his co-defendant Krivoi's counsel; and (2) failing to move to sever Ivanitsky's trial from Krivoi's, particularly after the testimony regarding the AK-47 was admitted into evidence.  "After a review of the record in its entirety and without giving undue significance to retrospective analysis," the appeals court was "satisfied that the defendant received the effective assistance of counsel."  Ivanitsky I, 81 A.D.3d at 977.

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense."  Wiggins v. Smith, 539 U.S. 510, 521 (2003).  To satisfy the first prong, the record must reflect errors that "cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness."  Wilson v. Mazzuca, 570 F.3d 490, 502 (2d Cir. 2009) (quoting Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir. 2009)).  Prejudice can be shown if a petitioner shows a "'probability sufficient to undermine confidence in the outcome.'"  Id. Ineffective assistance of counsel claims are reviewed under AEDPA deference.  Cullen v.

Pinholster, 563 U.S. 170, 189-90 (2011).  The state court's conclusion as to effective assistance of counsel was not unreasonable under this "doubly deferential" standard. Id. (quotation omitted).

First, Ivanitsky argues that his counsel should have objected when the State elicited Gozman's testimony that Ivanitsky told him that "in order to kill a person with a knife, one is supposed to be a professional killer."  (Tr. 2135.)  But "when to object and on what grounds are matters of trial strategy."  Duren v. Lamanna, No. 18-cv-7218 (JS), 2020 WL 509179, at *22 (E.D.N.Y. Jan. 30, 2022).  Moreover, Ivanitsky has not shown that any objection on these grounds had a chance of success, particularly given that Ivanitsky's statement did not actually describe a past crime or other bad act. See Morenito v. Fischer, 409 F. Supp. 2d 170, 176 (W.D.N.Y. 2006). Ivanitsky has also failed to demonstrate that the introduction of this statement had a "substantial and injurious" effect on his defense, required to show prejudice on habeas review.  Duren, 2020 WL 509179, at *22 (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Next, Ivanitsky argues that counsel's failure to act when Gozman, on cross-examination by Krivoi's counsel, implicated Ivanitsky in the murder of Kobozev, the Flora kidnapping, and in the Tatarin Brigade more generally constitutes ineffective assistance.  Giving both counsel and the state court the deference they are due, Ivanitsky has not shown that this alleged failure did not result from counsel's legal strategy, since the likely intent of eliciting this testimony was to impeach Gozman's credibility.  Ivanitsky also argues that counsel should have objected to the court's ruling that Ivanitsky could not argue on summation that he did not participate in the Flora kidnapping.  Ivanitsky similarly has failed to show that this choice was also not a matter of trial strategy because the judge simultaneously ruled that the State was barred from asking Gozman on redirect to describe Ivanitsky's role in the kidnapping in additional detail.  (Tr. 2486-87.)

19

Finally, Ivanitsky argues that counsel should have moved to sever his trial from Krivoi's, especially after the court ruled that the State could bring in the AK-47 once counsel had opened the door to this evidence.  Counsel was not ineffective in failing to make that motion; it is not ineffective to fail to make a motion that has a slim likelihood of success given New York's rules regarding severance.  Where proof against both defendants was based largely upon the same evidence—here, the testimony of the cooperators—"only the most cogent reasons would have warranted a severance."  Morenito, 409 F. Supp. 2d at 177 (citing People v. Mahboubian, 74 N.Y.2d 174, 183 (1989)).  Severance is required "where the core of each defense is in irreconcilable conflict with the other and where there is a significant danger, as both defenses are portrayed to the trial court, that the conflict alone would lead the jury to infer defendant's guilt." Id. (citing Mahboubian, 74 N.Y.2d at 184).  Under AEDPA deference, I cannot overturn the Appellate Division's finding of counsel's adequate performance, Ivanitsky I, 81 A.D.3d at 977, because both Ivanitsky and Krivoi's strategy primarily focused on discrediting the two cooperating witnesses and neither co-defendant implicated the other in the homicides.  The trial record also reveals that Krivoi's counsel led the effort to discredit Gozman and Sarkisov, so Ivanitsky's counsel's choice not to move for severance reflects reliance on that sound trial strategy.  See e.g., Banks v. Smith, No. 1-cv-72061-DT, 2002 WL 1480810, at *7 (E.D. Mich. June 27, 2002).

## VI.    Alleged Brady Violation

Finally, Ivanitsky does not clearly explain his sixth claim, an alleged Brady violation.  He originally raised a Brady claim based on the prosecution's failure to disclose Nayfeld's pre-trial interview with the FBI that impeached Sarkisov's testimony about receiving the guns in a tennis bag.  (Orig. Pet. 75 (incorporating Krivoi's direct appellate brief); Ex. J. 15-22.)  This claim was unexhausted because it relied on evidence "dehors the record of appeal." Ivanitsky I, 81 A.D.3d

at 977.  I stayed his original habeas petition so that he could exhaust his <u>Brady</u> claim in state collateral proceedings.  (D.E. #16.)  The § 440 court did not construe Ivanitsky's collateral papers to raise a <u>Brady</u> claim (440 Op. 2; <u>see</u> <u>supra</u> n. 6), and a review of Ivanitsky's collateral briefing accords with this finding, (<u>see</u> Am. Ex. 1-25).  In Ivanitsky's Amended Petition he provides a one sentence explanation of a <u>Brady</u> violation: "Prosecution failed to disclose true nature of Cooperation agreement and other vital matters involving cross-examination of Cooperating witnesses."  (Am. Pet. 11.)

To the extent that Ivanitsky's current habeas petition advances <u>Brady</u> claims for grounds other than the Nayfeld statement, they are unexhausted and now untimely.  They are unexhausted because the state court never ruled on the merits of this unexplained <u>Brady</u> claim, and they are untimely because they <u>per se</u> do not relate back to the claim Ivanitsky raised in his original petition about the Nayfeld statement, and so would be advanced more than one year after his conviction became final in 2012, excluding the time his § 440 proceeding was pending.  <u>Rodriguez v. Burge</u>, No. 2-cv-4594 (CBA), 2007 WL 13413, at *4-6 (E.D.N.Y. Jan. 2, 2007); <u>see also</u> <u>Musgrove v. Filion</u>, 232 F. Supp. 2d 26 (E.D.N.Y. 2002); <u>see also</u> <u>Duncan v. Walker</u>, 533 U.S. 167, 172-73 (2001) (28 U.S.C. § 2244(d)(2) provides that state collateral proceedings toll AEDPA's one-year statute of limitations, but federal habeas proceedings do not).

To the extent Ivanitsky's <u>Brady</u> claim is based on the Nayfeld statement he identified on direct appeal, it is unexhausted but dismissed as meritless.  28 U.S.C. § 2254(b)(2).  Although it appears that the prosecution should have disclosed Nayfeld's statement that she never transferred a tennis bag of weapons to Sarkisov (440 Op. 6-8), the evidence was more exculpatory of Ivanitsky's co-defendant, Krivoi, than it was of Ivanitsky himself because it could have undermined Krivoi's link to the murder weapons.  In ruling on the merits of Krivoi's habeas

petition, the Honorable Gary R. Brown reasoned "Nayfeld's <u>exculpatory testimony does not sufficiently undermine confidence in the verdict to warrant</u> habeas relief" given the overwhelming evidence presented to the jury and the fact that "the disputed transfer of the murder weapons from Nayfeld to Sarkisov may not have been essential to the Government's case." <u>Krivoi</u>, 573 F. Supp. 3d at 827.  On the merits, I find that the Nayfeld statement does not undermine my confidence in Ivanitsky's conviction.

**CONCLUSION**

For the foregoing reasons, Ivanitsky's motion is DENIED.  Because he has failed to make a substantial showing of a constitutional right, no certificate of appealability shall issue.  28 U.S.C § 2253(c)(2).  The Clerk of Court is directed to enter judgment accordingly, to mail Ivanitsky a copy of this Memorandum and Order, and to close the case.

SO ORDERED.

Dated: November  4  , 2024
      Brooklyn, New York

                          /s/Carol Bagley Amon
                          Carol Bagley Amon
                          United States District Judge